PUBLIC UTILITIES COMMISSION *vs.* EAST PROVIDENCE WATER CO.

SAME *vs.* SAME.

MARCH 7, 1927.

PRESENT: Sweetland, C. J., Stearns, Rathbun, Sweeney, and Barrows, JJ.

*(1)   Public Utilities.   Increase in Rates.*

While a great increase in rates by a public utility is not conclusive upon the question of their reasonableness, that circumstance calls for a very careful consideration of the grounds upon which the advance is made.

*(2)  .Public Utilities.   Reasonable Rates.*

The rate which should be fixed by a Public Utility, under the standard of a fair return upon the value of its property necessarily employed in rendering the service, should not exceed what the service is reasonably worth to the public in the circumstances of a case under consideration.

*(3)   Public Utilities.   Reasonable Rates.*

In proceedings for the determination of what is a fair and reasonable rate to be charged by a Public Utility the value of the property of the Utility

which it necessarily employs in rendering the service is the base rate and constitutes a matter of vital consideration.

*(4)  Public Utilities.  Rates.  Fair Value of Property.*

While reproduction less depreciation of the property employed by a public utility is a proper element for consideration in fixing rates, there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.

*(5)  Public Utilities.  Charges for Fire Service.*

Where a water company furnishing water to a town for fire protection maintained pressure in its water mains much higher than that in the mains of an adjoining fire district, and had made two connections between the mains of the two water systems and had an agreement with the fire district that in case of a serious fire it would furnish water to the fire district, if there should be a "stand by" service charge in connection with this emergency connection, it should be a charge against the fire district, and not against the town.

*(6)  Public Utilities.  Waters.*

Where a water company expecting to sell water to a fire district had installed an extensive water main through a sparcely inhabited district, and the expected business was not realized, the utility must stand the loss and can not be permitted to place the burden on the public.

*(7)  Public Utilities.  Waters.  Rates.*

In arriving at the value of the property of a water company for the purpose of fixing rates, hydrants supplied by the town should not be included in the inventory.

*(8)  Public Utilities.  Rates.  Waters.*

If it appears that the business of a public utility has been conducted for the benefit of those in control, in disregard of the public interest, a deficit arising in those circumstances is a proper subject of inquiry, in fixing reasonable rate.

*(9)  Public Utilities.  Rates.  Losses and Gains.*

In fixing rates to be charged by a public utility, former losses or gains do not enter into the question of the present value of its property.

*(10)  Public Utilities.  Rates.  Waters.*

While a utility may well seek an increase in rates because of a deficit in income under existing rates, it cannot be permitted to amortize such losses by an increase in the valuation of its property on that account.

*(11)  Public Utilities.  Rates.  Waters.  Improper Charges.*

Where the owner of water company also owned a dye works and furnished water to the dye works at less than cost of the service, this constituted improper preferential and discriminatory charges for the benefit of the dye works.

*(12)  Public Utilities.  Rates.  Waters.  Property Devoted to Public Use.*

When a water company acquired a pond and water rights as a public utility the property became devoted to a public use and the water company can not be permitted to divest itself of ownership of such property by conveying it to a corporation in which the controlling interests of the water company also had a controlling interest unless it clearly appears that such action is in good faith and that the property so held in trust is not at present nor prospectively necessary for the public use.

*(13)  Public Utilities.  Rates.  Waters.*

When the owner of land on the banks of a stream has by the exercise of a right of flowage created an artificial pond upon his land the right to use the water thus stored is exclusively in such owner, and the proprietors of land bordering on such artificial pond do not acquire any right in the water therein upon the ground that by flowage the shores of the pond have been brought to their land.

*(14)  Public Utilities. Rates.  Waters.*

In the matter of fixing of rates of a public utility, there should be full investigation of all the circumstances connected with the sale of a pond by the public utility, as a result of which the use of water by one of its customers largely fell off; so that it may be determined whether the utility has dealt fairly with its other customers in thus placing in the hands of one customer the power to largely decrease the revenue of the utility and throw the burden of maintenance more heavily upon its other customers.

INVESTIGATION by Public Utility Commission of rates filed by public utility. Heard on appeals from order of Commission approving rates. Order reversed, without prejudice to utility to file further schedule.

SWEETLAND, C. J.   The above entitled proceedings are appeals from the order of the Public Utilities Commission approving as just and reasonable a proposed schedule of rates, rules and regulations filed by the East Providence Water Company. The first named appeal is upon the petition of the town of East Providence; the second is upon the petition of the East Providence Fire District, a quasi municipal corporation within the town of East Providence.

The order of the Commission was entered after an investigation instituted upon its own motion as to the reasonableness of said schedule of rates. The reasons of appeal set out in each petition are identical and are substantially that the Water Company had failed to sustain the burden

of proof as to the necessity of the increased rates contained in the schedule under investigation and that said rates are unjust, unreasonable and discriminatory.

The water supply of the respondent is obtained from the Ten Mile river at Hunts Mills, in the town of East Providence.   At that point its pumping and purification plants are located.   Water was first taken from the stream by the original owner of the Water Works plant in 1893.   According to a plat filed in the case, Hunts Mills appears to be about a mile and a quarter above the point where the river empties into tidewater at the Seekonk river.   Near the mouth of the Ten Mile river there is a dam erected across the stream causing the flowage of the land above into an irregular shaped pond about one half mile long, known as Omega Pond.   In what manner and to what extent the original owner of the Water Works plant acquired the right as against the lower riparian proprietors particularly the owners of Omega Pond to divert water in large quantities from the stream at Hunts Mills does not appear upon the record.   In 1901 Mr. Frank A. Sayles, prominently engaged at that time in the bleaching, dyeing and finishing industry in this State, purchased the East Providence Water Company, acquired the water rights at the mouth of the Ten Mile river and the ownership of and flowage rights in Omega Pond.   He also at about that time purchased the plant of a competitor in the finishing business.   This plant was known as the Glenlyon Dye Works, situated near the shores of Omega Pond.   Mr. Sayles continued to own and operate the respondent Water Company and the Glenlyon Dye Works until his death.   Since his death the Water Company and the Dye Works have been owned and operated by the Sayles Estate trustees as successors to Mr. Sayles, deceased. At the time of its purchase by Mr. Sayles, the respondent supplied water by high service mains to domestic and industrial takers in the East Providence fire district which includes all the town of East Providence outside the Watchemoket fire district.   The water supply of that latter district

is purchased from the Water Works of the city of Pawtucket. The respondent at the time of Mr. Sayles' purchase also supplied water to the town of East Providence for fire protection within the East Providence Fire District.

In 1907 the respondent constructed a 12-inch water main from Hunts Mills to the Glenlyon Dye Works, through which up to the present time the respondent has supplied water in large quantities upon low pressure exclusively to the Dye Works, the amount supplied being about 60% of the total amount pumped from the stream at Hunts Mills.

The proposed schedule filed by the Water Company increases the rates to domestic and industrial takers of water other than the Dye Works by substantially 50%; as to the Town for fire protection the rates are increased from $20 per hydrant to $129 per hydrant, or about 635%. This great advance in rates is not conclusive upon the question of their reasonableness. That circumstance, however, calls for a very careful consideration of the grounds upon which the advance is made. The statute prescribes that at a hearing involving a proposed increase of rates "the burden of proof to show that such increase is necessary in order to obtain a reasonable compensation for the service rendered shall be upon the public utility." Sec. 48, Chap. 253, Gen. Laws 1923. What constitutes a reasonable rate for the services of a public utility is a question very difficult of determination. The statute quoted above refers to the rate as a reasonable compensation for the service rendered. The utility should be allowed a fair return upon the value of its property necessarily employed in rendering the service. The rate which reasonably may be fixed in accordance with that standard, however, should not exceed, and in most instances does not exceed, what the service is reasonably worth to the public in the circumstances of a case under consideration. In all proceedings for the determination of what is a fair and reasonable rate, the value of the property of the utility which it necessarily employs in rendering the service is the rate base and constitutes a matter of vital

consideration.   *Smyth* v. *Ames*, 169 U. S. 466, at 546.   In
the case before us that question is one of great complexity.
The Water Works plant has been in operation for about
thirty-five years, under three different owners.   Many of
the records showing the original cost of the property of the
Water Company are not now available.   The amount of
such cost is entirely the subject of estimate, as is also the
extent of the physical deterioration of much of its property
and the amount which should be deducted in value on
account of such depreciation.   There have been great
changes in the market price of such property during the
years of its use and nearly all the items which should be
considered in determining the value of the property of the
Water Company as it now exists must be obtained from the
estimates and conclusions of experts with regard to matters
of a highly technical character, as to which the members
of the court are entirely without personal knowledge.   The
extent to which a court may base its conclusions upon such
expert evidence will depend upon its confidence in the
experience and skill of the witnesses and also in their im-
partiality and candor.   Some conclusion as to the value
of the testimony of an opinion witness may be formed from
a comparison of his evidence with that of other evidence of
the same character presented by an adversary party.   It
may also be tested by cross-examination.   Cross-examina-
tion, however, upon technical matters furnishes little
assistance unless such cross-examination is conducted with
the advice and assistance of other experts.   An unfortunate
circumstance connected with the investigation now under
review is that no evidence was presented on behalf of either
of these appellants or any other customer of the Water
Company.   The hearing was practically *ex parte* and the
sole evidence as to the value of the property of the Water
Company and the reasonableness of the proposed rates was
that contained in the testimony of an expert witness, who
was a member of the firm of engineers of Boston, employed
by the Water Company, under whose supervision the pro-

posed schedule of rates had been prepared. The Water Company is not blamable for this situation, and if the evidence presented by it appears to us to be convincing as to reasonableness of the proposed rates, the Town can not reasonably complain, for it has had ample opportunity to meet the claims of the Company. Although the Town made practically no effort to contest the Water Company's contention at the investigation before the Commission, it has now employed special counsel to appear before us upon these appeals, and we have had the benefit of his analysis of the record in his brief and argument. We are also assured by that counsel that if the Town is now given an opportunity to be heard it is prepared to employ competent expert engineers to testify before the Commission as to the unfairness and discriminatory nature of the proposed schedule.

(4) The expert testified that in preparing the proposed schedule he first estimated the present reproduction value of the Water Company's property less depreciation and found the value by that method to be about $1,250,000 and after a somewhat complicated system of estimate he fixed upon a value of $990,000 which he afterwards used as a rating base. The authorities are not uniform with reference to the method properly to be used in determining the fair value of the property of a public utility used in its service to the public. The leading case upon the subject appears to be *Smyth* v. *Ames*, 169 U. S. 466, at 546. In that case the court said: "We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway" (*i. e.* a railway) "under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required

to meet operating expenses, are all matters for considera-
tion, and are to be given such weight as may be just and
right in each case.   We do not say that there may not be
other matters to be regarded in estimating the value of the
property.   What the company is entitled to ask is a fair
return upon the value of that which it employs for the
public convenience.   On the other hand, what the public
is entitled to demand is that no more be exacted from it for
the use of a public highway" (a railroad) "than the services
rendered by it are reasonably worth."   In *Bluefields Water
Works* v. *Public Service Commission*, 262 U. S. 679, it was
held that the estimated cost of reproduction new less
depreciation in the circumstances of that case was properly
a matter which should not have been disregarded, and in
the recent case of *McCardle* v. *Indianapolis Water Co.*, 47 Sup.
Ct. Rep. 144, opinion filed November 22, 1926, the United
States Supreme Court has treated reproduction less deprecia-
tion as a proper element for consideration in fixing rates.   The
latter cases were clearly not intended as a modification of
the rule set forth in *Smyth* v. *Ames*.   They both are in line
with the proposition that "there must be a reasonable
judgment having its basis in a proper consideration of all
relevant facts."   *Minnesota Rate Cases*, 230 U. S. 352.

After fixing upon $990,000 as the total value of the
respondent's property the expert made an allocation of the
value of property which he estimated was employed to
render service in each of the three distinct branches of the
company's business, viz., high service to domestic and in-
dustrial takers, high service to the town for fire protection
within the district, and low service by special main to the
Glenlyon Dye Works.   The percentage of the company's
property allocated to these different branches were to the
high service other than for fire protection 42%, to high
service for fire protection 41% and to low service to the
Dye Works 17%.   The rate of return upon the property
thus valued was fixed at 5%; which rate of return appears
to the court to be fair and as to its reasonableness the

appellants raise no question. Added to the result thus obtained the expert estimated the cost of operation and the necessary expenses which should be charged against each of these different branches and fixed upon an increased rate of about 50% to domestic and industrial takers upon the high service. The rate to the Glenlyon Dye Works had been fixed in 1922 at 10c per 1000 gallons by a private arrangement of the owner of both plants. This rate for the Dye Works the expert regarded as fair and did not change. His reasons for failing to change the rate for this low service appears to be partially at least due to considerations of policy as he says, on page 68 of the transcript, that if more was charged the Dye Works would seek its water elsewhere. "I think we are at the border line in the 10c rate for large industrial users. I won't say you could not go to 11c. I will say if you went to 15c they would not pay it." It appears from the record that large quantities of pure water are essential to the business of the Dye Works and the sole sources of supply appear to be the respondent Water Company, or the Watchemoket Fire District from the water purchased by that district from the city of Pawtucket for which it pays 11.3c per 1000 gallons, or from the waters of Omega Pond, of which supply we will speak later. It appears from the record that while the Dye Works because of its necessities should not be charged for water at a greater rate than the water is fairly worth, no consideration of policy need prevent the fixing of a rate which amounts to just compensation.

As to the charge to the Town for fire protection the expert as a result of his estimate concerning the allocation of property and expenses to that service reached a result of $38,425 as the amount of return which the respondent should receive from that service. This result would have necessitated raising the charge to the Town per hydrant from its former rate of $20 to a rate of $224 per hydrant, or over 1100%. Apparently the expert hesitated to impose this enormous advance and in so far as fixing the rate for

fire protection was concerned he entirely abandoned his method of allocating value to the different branches of the service and proceeded upon the following plan.   He compiled from data found in the reports of utilities commissions of seventeen states a table of the gross annual revenues of privately owned water works in those states and also the annual revenues for fire protection service in the same states and found that the proportion of revenue from fire protection to the total revenue varied from 4% in one state to 30% in another.   He finds the average of all to be 13% and then arbitrarily decides that he will place the revenue to be charged against the Town in the case before us of at $22,000 or about 16% of the estimated gross required revenue of $137,000.   This method of fixing rates appears to us to be extremely unscientific and the result is entitled to little if any weight.   It appears that the annual rate per hydrant for fire protection service in the Watchemoket fire district is $20.   It may be urged with reason that the charge in Watchemoket furnishes no standard for fixing the charge in the East Providence Fire District, because of different conditions existing in the two districts, if such be the fact. This objection is equally applicable to the adoption of a standard based on the averages appearing in the expert's table of percentages, since we, and apparently the expert, are without knowledge of the conditions which brought about the wide variations in percentages shown in his table, and neither he nor we are aware of whether the situation in the East Providence Fire District is comparable to that in any of the states included in the expert's table and, if it is, to the situation in which one.

The expert provided for the payment of this charge of $22,000 from the Town in this manner;  he made a charge of $40 per fire hydrant and then a service charge of $15,000. The nature of this service charge is uncertain.   The commission in approving it appears to have considered it as justified because it included compensation for "standby fire service to Watchemoket Fire District."   Neither the

commission nor the respondent has stated as to how much of the service charge should be ascribed to the "standby" service and how much to other considerations.  But from the importance which the commission appeared to place upon it we are led to believe that the service charge was approved principally on account of the standby service.  The so-called "standby" service is of this nature.  The pressure in the mains of the respondent is much greater than that in the mains in the Watchemoket District.  In case of a serious fire in the Watchemoket District, necessitating the use of a large quantity of water, the ordinary pressure in the Watchemoket District would become inadequate to meet the situation and two connections have been made between the mains of the two water systems and the respondent has an agreement with the Watchemoket Fire District that in case of a serious fire in that district it will open one or both of these connections and furnish water to Watchemoket at an agreed price, the amount to be ascertained by meters placed at the connection between the systems.  This standby service is entirely for the benefit of Watchemoket and the expert when pressed upon the point admitted, at page 190 of the transcript, that equitably the charge should be made wholly against the Watchemoket Fire District rather than for fire protection in the East Providence Fire District.  It appears in the questions of the chairman that the Watchemoket Fire District is a quasi municipal corporation with a system of fire protection of its own.  In operating that system, among other things it has an agreement in its own name with the respondent Water Company to supply water to it at high pressure in case of serious fire in the district.  If there should be a standby service charge in connection with this emergency connection with the mains of the respondent Water Company it should be a charge against the Watchemoket District.  Whatever arrangement, if any, exists whereby the Town aids the Watchemoket District in supplying fire protection in that district does not appear upon the record.

As far as appears, however, it would be a matter of agreement between the town and that district; and it is not within the province of the Public Utilities Commission to put some of the burdens of the Watchemoket District upon the Town in this proceeding. That is a matter which should be left for arrangement between the Town and that district.

(6) For the reasons which we have stated no cross-examination of the expert was had which would test the value of the technical testimony given by him. The chairman of the commission, however, by reason of his long residence in East Providence and his intimate knowledge of local conditions there, was able to ask the witness a number of pertinent questions upon matters not technical. It appeared in the questions of the chairman that at one time the respondent had expected to sell water to a fire district in Massachusetts and on the strength of that expectation had installed an extensive water main of large size to the Massachusetts state line through a district sparsely inhabited; that the hope of business in Massachusetts was not realized and the respondent had been left with this main which in size and cost greatly exceeded any needs of the service. The witness' explanation as to why, for fixing the rate base, this main should be appraised at its full present value does not appear satisfactory to us. While a public utility is warranted in making some reasonable and conservative construction in anticipation of the future growth of its business if it largely misjudges such future growth or, as appears in this case, builds for the purpose of acquiring an entirely new branch of business, and if that purpose fails the utility must stand the loss and can not be permitted to place the burden on the public. *San Diego Land Co.* v. *Jasper,* 189 U. S. 439; *Union Hollywood Water Co.* v. *Los Angeles,* 178 Cal. 206.

(7) It appears in the evidence that the town of East Providence paid for the original fire hydrants installed in the district and the expert has inventoried such hydrants at their present value as part of the respondent's property.

The expert admits that the inclusion of these fire hydrants in the inventory was inequitable. From the questions of the chairman it also appears that in some instances a householder in order to obtain the service of the Water Company has been obliged by the respondent to have the connection between his premises and the mains of the respondent constructed at the householder's own expense. We also gather that in the rules of the Company in force before the filing of the proposed schedule there was no provision for reimbursement of the householder by the respondent for this expense although such connection is afterwards used to supply other customers of the respondent. This suggestion of the chairman was not contradicted by the respondent nor does it offer to show that the present value of such connections was not included in the inventory of the property of the respondent for the purpose of fixing the rates proposed. The respondent claims that such inclusion is fair and proper. There is a difference of opinion in the authorities as to the principle involved. In most cases it has been held that land acquired by a railroad through the free grant of a state or the national government may properly be valued as part of the property of the railroad for the purpose of fixing rates. But there is much support for the rule that the value of property of the kind now under consideration, which has come into the possession of a public utility in the manner which we have stated, should not, equitably and fairly, be considered in the fixing of rates. *San Diego Water Co.* v. *San Diego,* 118 Cal. 556; *San Joaquin* v. *Stanislaus County,* 191 Fed. 875. In our opinion the hydrants supplied by the town should not be included in the inventory. As to the private main construction, referred to, the exact situation does not clearly appear in the record and we do not pass on the propriety of its inclusion in the inventory.

The expert in his testimony laid considerable stress upon the deficit in income which he claims the respondent had suffered under the former rate, and the respondent in its

original brief sets out the same claim.   To the appellants' contention that the apparent deficit in income was due to improper management, the respondent urges in its reply brief that the consideration of any past mismanagement is irrelevant to the present inquiry.   It is true that all losses arising from past errors of judgment may not be urged against an increase of rate, but if there has been more than an error of judgment, and it appears that the business of a public utility has been conducted for the benefit of those in control in disregard of the public interest then a deficit arising in those circumstances is a proper subject of inquiry. These alleged deficits do not represent losses in the early period of the establishment of the respondent's business but in years subsequent to that.   The respondent further urges that former losses or gains do not enter into the question of the present value of its property.   That may be taken as a correct statement of a general legal principle. *Galveston Elec. Co.* v. *Galveston,* 258 U. S. 388.   From an examination of the record, however, we are left somewhat in doubt as to whether the expert in estimating the value of the respondent's property did not let the fact of past deficit enter into his estimate and did not follow a principle now held to be erroneous:   that such deficit may be re- garded as properly entering into an estimate of the present value of the property for the purpose of fixing rates.   On page 77 of the transcript he testified, in answer to questions by the chairman, as follows:   "Q.   The effect of the values which you set up here accomplish two things:   one is to overcome the operating deficit of this company and pay a return upon the actual money actually invested in the construction items of the plant?   A.   Yes.   Q.   And the other thing that it does is to pay a return upon the original value that has been created because of the economic changes of the last ten years?   A.   That is true.   That is true, sir. That is my interpretation of the law.   I may be wrong in that sir."   We are somewhat in doubt as to the witness' meaning.   A utility may well seek an increase in rates

because of a deficit in income under existing rates but it can not be permitted to amortize such losses by an increase in the valuation of its property on that account. It can hardly be urged from this testimony that the witness was intending to amortize past losses or prevent their recurrence in the future by an increase in the rate of return because he fixes on 5% as a fair return upon the estimated value of the respondent's property without adding anything to the rate on account of past losses. He had been speaking of operating deficits occurring more than two years before the time of his testimony. During those two years there had not been deficits but a considerable surplus of income over operating expenses. If the witness sought, as a part of the effect of his valuation, to accomplish the overcoming of the operating deficits of the company which had occurred more than two years before he could only gain that end by letting the amount of such deficit enter into his estimates of value, thus adding them to capital as had formerly been held to be proper. We think it is not unfair to place that construction upon his testimony. Whatever the witness may have intended, however, the matter of the claimed deficit has been presented to us and we should consider its nature.

The records fully warrant the finding that the purpose of Mr. Sayles in purchasing the respondent Water Company and the Omega Pond was to control the water supply of his competitor and as a result to acquire his competitor's plant, and further that his purpose in retaining these two sources of water supply was because they were absolutely essential to the operation of the industrial plant which he had then acquired. We feel that it is not unfair to say that since that time the respondent Water Company has been conducted primarily as an adjunct of the business of the Glenlyon Dye Works and only secondarily as a public utility. In 1907 the respondent installed the 12-inch low service main from Hunts Mills to the Dye Works at a cost of $35,000 and by it water in large quantities was furnished to the Dye Works at the rate of 3c per 1000 gallons. This rate remained in

force until September, 1922, when at about the time the expert engineers began their employment for the preparation of the proposed schedule of rates, the rate was raised to 10c per 1000 gallons.  For a number of years before that time there had been an operating deficit.  This deficit in 1920 amounted to $14,229; in 1921 to $15,201; in 1922 the deficit was reduced to $10,831 for in September of that year the rate to the Glenlyon Dye Works had been raised to 10c per 1000 gallons, and in 1923, when the increased rates were in force throughout the year, the deficit was changed to an operating surplus of $18,074.  The conclusion is warranted that the so-called deficit may fairly be ascribed to the low rate that the owners of the Water Company were charging themselves for water which they were using in their other enterprise, the Glenlyon Dye Works.  All of the water furnished the Dye Works was first purified, at a cost for chemicals of about 1c per 1000 gallons before 1916 and after that year at a cost of from 1½ to 2c per 1000 gallons.  The irregular demand of the Dye Works required an increased capacity in the purification plant of the company.  When a proper return is considered upon the investment of $35,427 for the special main, that for the increased capacity of the purification plant and for the special pumping machinery, and when to those items are added the cost of purification, the expenditures for labor, maintenance and taxes, it is clear that the company was continuing to furnish water to the Dye Works up to September, 1922, at less than the cost of the service.  This clearly constituted improper, preferential and discriminatory charges for the benefit of the Dye Works.

In 1924 what has been termed the operating surplus was reduced from $18,074 to $5,151.  The experts figured that this was due to the decreased use of water by the Dye Works arising from a depression in its business.  From the record we find, however, that a considerable portion of the decrease in revenue from the low service to the Dye Works in 1924 can be ascribed to the fact that in that year the

Dye Works pumped for itself from Omega Pond 124,941,931 gallons, more water than it had ever pumped from that source before. This brings us to a consideration of the relation of the Omega Pond to the respondent.

Soon after Mr. Sayles purchased the respondent company (12) and the Dye Works, the respondent, through Mr. Sayles, became the owner of Omega Pond with the dam at the mouth of the pond and the water rights about the dam. The record justifies us in finding that at that time, in 1906 or 1907, the respondent acquired exclusive title to these properties and rights and retained them until 1922, when at about the time of raising the rate to the Dye Works and the beginning of the preparation of the proposed schedule of rates by the engineers the respondent conveyed these properties to the Sayles Finishing Company, Inc., the corporation owned by the Sayles Estate trustees which operates the Glenlyon Dye Works. When Omega Pond and the water rights were acquired by the respondent as a public utility those properties became devoted to a public use, and the utility can not be permitted to divest itself of ownership unless it clearly appears that such action is in good faith and that the property so held in trust is not at present nor prospectively necessary for the public use. The respondent contends that the property is useless to it as a public utility. If that be so it is pertinent to inquire as to what was its use to the respondent when the property was purchased by it from Mr. Sayles. In 1918 the respondent rebuilt the dam at the mouth of the pond at the expense of $85,614. The dealings between the owner of the respondent and the respondent with respect to Omega Pond are imperfectly shown on the record. The chairman at the hearing before the Commission suggested that there should be a careful consideration of the business dealings between the Sayles' interests and the Water Company yet as to the matters relating to the transfer of Omega Pond and the water rights from the respondent to the Sayles' interests in 1922 we find the record to be unsatisfactorily meager. There is testi-

mony from counsel of the respondent that when the Company originally became the owner of a part of this property it paid to Mr. Sayles $11,000 or $12,000 in cash, that by 1907 all the property in and about Omega Pond which had been acquired by Mr. Sayles became the property of the respondent and the Company gave to Mr. Sayles in payment unsecured notes, and in the same manner the respondent obtained the money to rebuild the dam at the cost of $85,614. Interest upon these advances has been charged against the respondent on the books of the Sayles Finishing Plant, Inc. Taxes upon the property undoubtedly have been assessed against the respondent as holder of the title. When the pond, the dam and the water rights were transferred by the respondent to the Sayles Finishing Plant, Inc., in 1922, the consideration of the conveyance appears to have been the crediting in favor of the respondent upon the books of the Finishing Plant, Inc., of certain amounts of the indebtedness arising upon these unsecured notes given for the building of the dam and the purchase of the property. Counsel for the respondent testified that "there was an enormous amount in interest which was released but not nominally included." The amount of such interest does not appear. According to the testimony of the expert accountant of the respondent after the transfer by the respondent there still remained an indebtedness due from the respondent of $20,000 on account of the dam, and $23,956 upon the purchase of real estate. It is not clear as to what purchase of real estate the witness had reference. The context seems to indicate that he refers to purchases of real estate about the pond and dam. Counsel for the respondent testified that "all the property that was disposed of was of no value to the Water Company as a public utility." If that be the fact, then during the entire period of its ownership this property had been equally valueless to the respondent. Yet after holding the property until it suited the purpose of the Sayles' interests to take possession of it the respondent is left with a large indebtedness on

account of a transaction which had never been of interest or value to it.

The appellants assert that the pond, the dam and the water rights connected with it are of value to the respondent for purposes of water storage and the sale of water to industries located near the pond and also in security of the respondent's rights to divert water from the stream at Hunts Mills located above the pond. From the record it appears that the entire rights of flowage, the land flowed and the water rights in and about the pond were in the respondent from 1907 down to the time that it conveyed all of these rights to the Sayles Finishing Co., Inc., in 1922. The appellants claim in argument that the respondent had been selling the right to pump water from the pond to other industries near the pond at the rate of 3c per 1000 gallons. We do not find that fact in the record but it does appear that the ownership of the right to pump water from the pond is valuable. It also appears that the Sayles Finishing Co., Inc. and the Glenlyon Dye Works have pumped water in large quantities from the pond and have done this without compensation to the Water Company. It was claimed by the expert and by counsel for the respondent that because of its situation upon the shores of the pond the Glenlyon Dye Works had the right to thus take water. This contention is not sound. When the owner of land on the banks of a stream has by the exercise of a right of flowage created an artificial pond upon his land the right to use the water thus stored is exclusively in such owner and the proprietors of land bordering on such artificial pond do not acquire any right in the water therein upon the ground that by flowage the shores of the pond have been brought to their land.

There are other considerations which bear upon the propriety of this sale of Omega Pond by the owners of the respondent. Soon after the raise of rates to Glenlyon Dye Works to a point which either was fair and undiscriminatory or approached that point and after all rights in Omega Pond had been conveyed to the Sayles Finishing Co., Inc.,

the use of the water by the Dye Works from the low service main fell off to a large degree and the pumpage of water by the Dye Works directly from Omega Pond more than doubled. In connection with those facts it should be borne in mind that, if water continued to be supplied by low service to the Glenlyon Dye Works at the increased rate and in quantities equal to the average consumption of former years, a large part of the gross income of the respondent would be derived from that source. In the matter of fixing rates there should be full investigation of all the circumstances connected with the sale of Omega Pond that it may be determined whether the owners of the respondent have dealt fairly with the other customers of the utility in thus placing in the hands of one customer the power to largely decrease the revenue of the respondent and throw the burden of maintenance more heavily upon its other customers. Upon a more complete showing of the facts involved in these transactions they may be explained consistently with fair dealing, but upon the present record the appellants' assertion appears to be not unwarranted that in dealing with the respondent its owners lost sight of their fiduciary relations to the utility and the public, and have treated the respondent merely as a subsidiary corporation to be dealt with as best suited the business interests of its owners.

In view of all the above we are not satisfied that the utility has carried the burden of establishing that the proposed schedule of rates are necessary, fair and reasonable. In view of the insufficiency of the record upon many points which we deem to be material, and the possibility that upon a more complete presentation of the facts it may clearly appear that the respondent is entitled to some advance in rates, and in consideration of the necessity of passing fairly upon the reciprocal rights of the utility and the public, we should be inclined, if such was within our power, to send the matter back to the Commission with direction for a rehearing. Our jurisdiction upon these

appeals is purely statutory and by the statute we are directed after hearing to either sustain or reverse the order appealed from.    In these cases we reverse the order of the Commission permitting the proposed schedule of rates to become operative.    We make this order without prejudice to the respondent to file another schedule of advanced rates. If such a schedule is filed and the Town desires to contest the necessity and reasonableness of the proposed schedule ample time and opportunity should be given to the Town to prepare its contest and to examine such of the property of the utility and such of the books and data in the possession of the respondent or the Sayles Finishing Plant, Inc. or the Sayles Estate trustees as appear to the Commission to be reasonably necessary in the preparation of such contest. While it appears that the experts who prepared the proposed schedule which has been under consideration were engaged for two years in that work it seems that in view of the investigation which has been held, a somewhat shorter time would now be sufficient for the Town in preparing to protect its interests and the interests of its citizens at any investigation which may be had as to the reasonableness of a new proposed schedule.

*Herbert A. Rice,* for petitioners on appeal.

*Edward R. Jastram, Claude R. Branch, William H. Edwards, Edwards & Angell,* for East Providence Water Company.