Town of Narragansett *vs.* Thomas A. Kennelly, *Public Utility Adm'r, et al.*

Union Fire District *et al. vs.* Same.
Town of South Kingstown *vs.* Same.

JUNE 3, 1955.

Present: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

192

FLYNN, C. J. These are three appeals under general laws 1938, chapter 122, §31, as amended, from a decision and order of the public utility administrator approving certain schedules of increased water rates and charges filed by the Wakefield Water Company. The appellants are the Town of Narragansett, hereinafter called Narragansett; the Town of South Kingstown, called South Kingstown; and the Union Fire District, called the Fire District. The real appellee Wakefield Water Company, hereafter called the company, is a public utility corporation serving certain communities in the towns of Narragansett and South Kingstown including the Fire District.

It appears that the company on December 16, 1952, by virtue of G. L. 1938, chap. 122, §45, as amended, filed with the public utility administrator a revised schedule of increased rates and charges for water service to become effective within thirty days. The administrator thereupon duly suspended the operation of said rates pending a public hearing which was advertised and held in accordance with law during the months of February and March 1954.

At these hearings evidence was presented by the company through its manager, accountants, and an engineering expert. The evidence for the appellants was confined to facts produced by cross-examination of such witnesses, and also by testimony and exhibits offered by a state accountant, who had made a personal survey of the company's property and books to provide the public utility administrator with information in connection with this tariff filing.

The evidence, which includes exhibits and reports of accountants, is so substantial and technical that it will serve no useful purpose to attempt to restate it in detail. In general it appears that the company was organized in 1888; that its stock was held largely by one person or family; that said stockholder at different times loaned sums of money at interest to the company; and that the latter provided water for certain parts of Narragansett and South

Kingstown. At the time of the hearing and for many years prior thereto the sole surce of its water supply was a reservoir at Rocky Brook in Peacedale, South Kingstown, formed by a natural watershed located on some 187 acres of land which was owned and maintained by the company.

At that place it also maintained and operated a pumping station, purification plant and standpipe. However, since about 1944 the company has obtained its entire supply of water from wells driven elsewhere. It continued to use the same standpipe, but the pumping station, purification plant, the watershed and the water in the reservoir have not been maintained or used and are not now being used in producing any of the water sold to its customers. In fact the equipment in the pumping station is admittedly in hopeless disrepair, is no longer useful, and the water in the reservoir has been permitted to become stagnant, unclean, and is in no sense ready for use without considerable delay and expenditures for pumping and purification.

It appears that the company's engineering expert did not make his recommendation from an independent engineering survey of values, costs and condition of the property being necessarily used in the present production of water. In one day he made a trip over the property and investigated the books as kept by the company. He later obtained his facts and figures from the books and from certain reports of previous engineers and from the company's annual reports to the public utility administrator.

A study of these factors led him to the conclusion that the company's rate base as of June 30, 1953 should be $1,364,663.43. At that time there were 1,500 outstanding shares of common stock amounting to $150,000; a bonded indebtedness in first mortgage bonds of $300,000; unsecured notes payable to banks amounting to $489,300; and additional notes payable totaling $60,308.34. In his opinion it was necessary for the company to produce an annual revenue of $125,666 in order to meet its debt requirements and costs

of doing business, which included in his computation an item of $17,056 for dividends on outstanding stock. Assuming such revenue was required, he estimated that on his proposed rate base it would be equivalent to a 5 per cent net rate of return, which he testified was reasonable.

On the other hand, by cross-examination of this witness and from testimony of other witnesses, the appellants showed that a rate base of $818,825.38 would be proper. In this testimony by the state's accountant, who had made a personal study and appraisal of the value and utility of the property, it was shown that the estimated cost value carried on the books of the company between the years 1888 and 1928 had been excessive to the amount of $135,-860.66. The company's expert also conceded that such value was overstated on the books by the amount of $120,000 or at least was not supportable to that extent.

In addition, the state's accountant excluded from his computation for rate-making purposes several items of cost or capital assets of the company which were included by the company's expert in his proposed rate base. Among these were the costs or book value, less depreciation, of certain properties and equipment which were not actually being used at the time to produce any water and most of which was not useful at all for such purposes without a considerable delay and expenditure of money.

Upon such evidence the administrator tentatively started his computations with the rate base suggested by the company's expert, and from that deducted certain of the items which were excluded by the state's accountant from his proposed rate base. However, a large portion of the book value of the pumping station, the reservoir, and the land which provided the water in the reservoir was included in the rate base which the administrator finally adopted in the amount of $874,230.45 as of June 30, 1953. He then accepted without change the total sum of revenue which the company's engineer had testified was necessary for the

company to obtain, namely, $125,000, and found that such amount represented a net rate of return of 5.4 per cent and was reasonable. Accordingly on June 29, 1954, by Order No. 6885, Docket No. 562, he approved in their entirety the increased rates and classifications as proposed by the company's filing of December 16, 1952.

The appellant Narragansett concedes that some increase in rates may be justified, but contends that the increases and classifications as granted were unreasonable, excessive and discriminatory. It complains particularly of an increase from $75 to $150 per million gallons for water sold at wholesale to Narragansett for the Point Judith section. There the town itself had installed its own mains and maintained its own standpipe without any investment cost to the company. Water for that section was purchased by Narragansett at wholesale through a master meter, and the increasing revenue therefrom constituted a substantial part of the company's annual income. The customers' meters which were used in that section were paid for by Narragansett at the annual rate of $5 per meter under an agreement with the company. It is argued secondly that the increase from $40 to $64 per hydrant, or an increase of 60 per cent for fire protection, was arbitrary and not supported by the facts in evidence; and thirdly that an increase from $25 to $34 for customers' meter supply, plus a decrease in the minimum allowance for such use, was unwarranted and excessive.

Running through Narragansett's argument is also a complaint that the increased rates and classifications were fixed to obtain revenue involving among other things a guarantee of dividends on stock, which is not properly within the purpose of fixing a base and making rates; that an attempt is being made by excessive rates to restore the company all at once to a position of financial integrity, notwithstanding that the real cause of the company's deficit was its large expenditure in one year for the Boston Neck Road and Bonnet Shores extension; and that, after an expected dor-

mant period, such extension each year has been providing an annually increasing revenue that, without any increase in rates, would probably wipe out its losses in a short time.

South Kingstown and the Fire District join Narragansett in all its contentions. South Kingstown further argues particularly that no increase in rates for that town is justified because comparative statements show that the company operated at a profit between 1946 and 1949; that its operating profit was then adversely affected by a large expenditure of $252,000 for the Boston Neck Road and Bonnet Shores extension; that since 1950 the extent of the annual loss caused thereby is being substantially reduced by increased revenue from the system at the previous rates; and that if the company's complete statement of 1953 had been submitted in evidence and used it would probably have shown a still further closing of the annual loss gap without any increase in rates, especially in South Kingstown. The Fire District, in addition to arguing certain other technical questions of law, seems to rely ultimately on the claim that even accepting the company's figures and the formula of its expert for fixing the rates for hydrants on the basis of supposed efficiency for fire protection, many of the hydrants being charged for at an increased rate in the district would not come within such formula.

It is well established that the findings of a public utility administrator, if supported by evidence, will not ordinarily be set aside unless they are unjust, unreasonable or discriminatory. However, this court has held: "The utility should be allowed a fair return upon the value of its property *necessarily* employed in rendering the service," and further pointed out: "In all proceedings for the determination of what is a fair and reasonable rate, the value of the property of the utility which it *necessarily* employs in rendering the service is the rate base and constitutes a matter of vital consideration." (italics ours) *Public Utilities Comm'n* v. *East Providence Water Co.*, 48 R. I. 376, 380.

198

In the instant case the rate base as fixed by the public utility administrator still includes a substantial part of the book value of the old pumping station, the land, and the reservoir at Rocky Brook. These were included notwithstanding the undisputed evidence that at the time of hearing these facilities had not been used in the production of the company's water for at least eight or ten years; that they are not now being used or maintained in producing any of its supply of water; and that they are not now presently useful, even in an emergency, without delays and special expenditures for pumping and purification treatment not available and useful in that plant.

While there is in evidence a mere statement by the company's manager that the pumping station and reservoir were being held for an emergency, it is clear on this record that they were actually not being used in producing any part of the water and were not being maintained as a true standby plant for emergency. Of course they were capital assets of the company, but on the evidence here they were not properly included in the rate base for rate-making purposes in accordance with the law and standards set out in *Public Utilities Comm'n* v. *East Providence Water Co., supra.*

It is also clear that the administrator misconceived the law and overlooked testimony in regard to the amount of revenue which was necessary to support increased rates. The figure of $125,666 for annual income, which was testified to by the company's expert as being necessary, included an item of approximately $17,000 for payment of dividends on outstanding stock. The administrator, although fixing a lower rate base than the one proposed by the company's expert, nevertheless adopted substantially those figures for required revenue as being reasonable in computing the needed revenue and a fair net rate of return on the rate base. On the evidence in this record there is no justification for including such dividends on stock in fixing the

rate base and no requirement as such that they must be figured in the rate of return.

The administrator also seems to have overlooked the evidence in connection with the proposed increase of 100 per cent for water sold at wholesale to Narragansett through its master meter. It is true the company's engineer stated that the cost of producing water at the master meter had risen from $75 to $134 per million gallons. However, when asked in cross-examination to break down that cost into its component elements, he specifically showed costs totaling only $82 per million gallons at that meter. Thus the rates and classifications proposed by the company's expert, and adopted by the administrator without change, are based to that extent on the erroneous assumption that the cost of producing the water at the master meter for wholesale to Narragansett was $134 per million gallons.

In the circumstances the administrator should first have figured that classification and rate on the basis of the cost of producing the water for wholesale at the master meter as established by the probative evidence. He then should have added a reasonable profit for the water sold at wholesale under the conditions as shown by the evidence. In the circumstances, therefore, we think the case should be remanded to the public utility administrator for re-examination of the evidence in this record in order to fix a new and proper rate base in accordance with the law as stated in *Public Utilities Comm'n* v. *East Providence Water Co.*, *supra*, and to exclude from the computation of required annual revenues the item which appears to be a guarantee to pay dividends on outstanding stock, and for such reclassification and increases as he shall then determine and approve as being in conformity with the law and the evidence.

It is also ordered that, before the public utility administrator makes his final determination in accordance with this opinion, the appellants should be afforded an oppor-

tunity to be heard in argument before the rates to be so fixed shall become final.

In each case the appeal is sustained, and each case is remanded to the public utility administrator with direction to reconsider this record and fix the new rates and charges in accordance with our opinion.

On Motion for Reargument.

JULY 15, 1955.

Per Curiam. After our decision in the above-entitled cases the respondent Wakefield Water Company asked leave to file a motion for reargument and stated therein certain reasons why a reargument was desired. Even if we assume that in view of such motion a reargument might be warranted to permit some clarification of the opinion in a certain aspect, a hearing thereon would not be possible until next October at the earliest.

Therefore, after consideration, it is our judgment that in the special circumstances the interests of all parties will be better served if the rate base is now determined so as to *exclude* the values of all property not necessarily being used and maintained in producing the supply of water, regardless of whether such values were included or excluded by the computations of the company's expert or the state's accountant; and that this and the other questions raised be resolved by the public utility administrator in accordance with the direction and order as stated in our opinion. If that is done without further delay, the final rates may be established in time for the company to have the advantage thereof during the current season when it should be receiving its greatest income.

Motion denied.

*James O. Watts, Town Solicitor,* for Town of Narragansett.

*Henshaw, Lindemuth, Siegl & Hinman, Daniel S. T. Hinman,* for Union Fire District.

*William H. Leslie, Jr., Town Solicitor,* for Town of South Kingstown.

*John P. Cooney, Jr.,* for Wakefield Water Company.