## No. 23086.

PUBLIC UTILITIES COMMISSION OF COLORADO, AND THE INDIVIDUAL MEMBERS THEREOF, HENRY E. ZARLENGO, HOWARD S. BJELLAND AND RALPH C. HORTON, AND SHAW HTS. HOME OWNERS ASSN., AND CAPITOL FEDERAL SAVINGS & LOAN ASSN. *v.* NORTHWEST WATER CORPORATION, A COLORADO CORPORATION.

(451 P.2d 266)

Decided February 17, 1969. Rehearing denied March 24, 1969.

156

DUKE W. DUNBAR, Attorney General, ROBERT LEE KESSLER, Assistant, for plaintiff in error Public Utilities Commission.

JOHN R. BARRY, for plaintiff in error Shaw Hts. Home Owners Assn.

GEORGE S. FULLER, for plaintiff in error Capitol Federal Savings & Loan Assn.

HAYUTIN AND HAYUTIN, IRVING J. HAYUTIN, for defendant in error.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

THE plaintiffs in error are (1) the Public Utilities Commission of the State of Colorado, and the individual members thereof (the Commission); (2) Shaw Heights Home Owners Association (Shaw Heights); and (3) Capitol Federal Savings & Loan Association. The defendant in error is Northwest Water Corporation, a Colorado corporation (Northwest). Plaintiffs in error filed a joint brief.

## THE PROCEDURAL FACTS

On May 10, 1965, Northwest filed an application (No. 21020) with the Commission to determine the rate base

and the rate of return to which Northwest was entitled as a public utility supplying water in its certificated area, commonly known as "Shaw Heights."

On November 8, 1965, the Commission held a hearing, after which it took the application under advisement. On November 29, 1965, the Commission issued its order, Decision No. 66346, requiring Northwest to furnish additional information and providing for a further hearing to be held after the additional information had been furnished. Northwest's request for a rehearing on the application was denied on December 23, 1965.

Northwest declined to furnish the information and then sought review of Decision No. 66346 in the District Court in and for the City and County of Denver. This proceeding was dismissed by stipulation of the parties on June 16, 1966; the stipulation, among other provisions, required a further hearing by the Commission in which specified data was to be furnished by Northwest.

On September 29, 1966, the Commission, by Decision No. 68272, entered its order (1) fixing Northwest's rate base as of September 30, 1965, at $271,467; (2) fixing its rate of return at 5% on the rate base; and (3) permitting applicant to file rate schedules increasing its annual gross operating revenue $25,309 to enable it to earn 5% on its authorized rate base.

Northwest petitioned the Commission for a rehearing, alleging, among other things:

"That the Order of the Commission effectively deprives the Applicant not only of its normal operating charges and expenses, but also of any return on Applicant's investment, and that it therefore results in the property of the Applicant being taken and used by the public without just compensation depriving Applicant of its property without due process of law."

The petition of Northwest for a rehearing was denied. Northwest again sought review in the District Court in and for the City and County of Denver. However, by order of the Chief Justice, in the interest of expediting

the review, the matter was transferred to the District Court in and for Arapahoe County. The latter court, after a hearing on the record of the Commission, pursuant to C.R.S. 1963, 115-6-15, entered a judgment dated June 9, 1967, which, in pertinent part, states:

"The Court finds that the order of the Commission is not just and reasonable and that its conclusions are not in accordance with the evidence. The record reflects that the staff of the Public Utilities Commission prepared a rate base based on the testimony and the exhibits admitted into evidence during the course of the Commission's hearing, but that thereafter the Commission chose to make certain adjustments, which the Court finds to be erroneous except for the adjustment as to what has been denominated as well No. 7.

"THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the case be remanded to the Public Utilities Commission for modification of the order of the Commission in accordance with the evidence which has been presented to it. * * * "

On a motion by Northwest for clarification of the June 9, 1967, judgment, the court, on June 19, 1967, entered a supplemental judgment in which it stated: "The Public Utilities Commission shall modify its prior order in accordance with the evidence which has been presented to it, as follows:

1. That the rate base of the Plaintiff shall be: $483,352.

2. That the rate of return to be allowed shall be: 5%

3. That the lease rentals set forth in the exhibit of the Staff are fair and reasonable.

4. That the gross revenues to which the Plaintiff is entitled, in accordance with the evidence presented and the record certified by the Commission to this

Court, is as follows:

Base figure, from page 11, Column 1 of the Commission's Decision #68272 (Total Operating Expense) $138,229.

Add rate of return (5.0%) shown above, on rate base of $483,352.00 $ 24,168.

Add income taxes, State and Federal $ 4,964.

Total gross revenues $167,361.

5. That the increase in gross revenues to which plaintiff is entitled under the modified order is as follows:

Revenues reflected on Page 10 of Decision #68272: $ 72,305.

Increases granted, Decisions #66803 and #68272: $ 63,809.

 $136,114.

Increase in accordance with this Order of Court $ 31,247.

. Gross revenues, as set forth in paragraph 4 above: $167,361.

" * * * that the above findings are hereby incorporated herein and by reference made a part of this Order; * * *"

### IMPOUND ORDER OF DISTRICT COURT

Following the trial court's judgment of June 19, 1967, the Commission moved the court for a stay of execution pending review by this court. The motion was denied. However, the court entered the following order:

" * * * the Court ORDERS the Northwest Water Corporation to pay into Court on the 1st of each month, there to be impounded until the final decision of the case, all sums of money which it may collect from any corporation or person in excess of the sum such corporation or person would be compelled to pay if the order or decision of the Commission had not been modified by the Court. * * *"

This order is still in effect and should remain in force until the final disposition of Application No. 21020.

The plaintiffs are here by writ of error challenging the correctness of the judgments of the District Court in and for Arapahoe County, dated June 9 and June 19, 1967. For purposes of our discussion, the two judgments will be treated as one, unless otherwise indicated. The judgment of the district court modifies Decision No. 68272 of the Commission.

## ASSIGNMENTS OF ERROR

Plaintiffs in error have preserved for our consideration the following assignments of error:

"I — The District Court has no authority to make new findings of fact and is limited to affirming or reversing the Commission decision.

"II — The Commission decision is just and reasonable and, therefore, the District Court should not have reversed portions of said decision.

"A. The reasonableness of the end result and consequences to shareholders of Northwest Water and consumers of Northwest Water is the test of the propriety of the Commission decision. The method steps by which the Commission draws its decision in a rate case are not subject to attack if the end result is just and reasonable.

"B. The adjustments made by the Commission to the proposed rate base and expense-revenue showing are just and reasonable and supported by the evidence."

## SCOPE OF JUDICIAL REVIEW

C.R.S. 1963, 115-6-15, prescribes the extent of the authority of the district court upon review of a decision of the Commission. In pertinent part it provides:

"(1) * * * No new or additional evidence may be introduced in the district court, but the cause shall be heard on the record of the commission as certified by it. The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the constitution of the United States

or of the state of Colorado, and whether the order of the commission is just and reasonable and whether its conclusions are in accordance with the evidence.

"(2) The findings and conclusions of the commission on disputed questions of fact shall be final and shall not be subject to review, *except that, in any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of petitioner under the constitution of the United States, or the constitution of the state of Colorado, the district court shall exercise an independent judgment on the law and the facts, and the findings or conclusions of the commission material to the determination of the said constitutional question shall not be final.* The commission and each party to the action or proceeding before the commission shall have the right to appear in the review proceedings. \* \* \* " (Emphasis added.)

The issue before us is brought into sharp focus by the following statement found in the Summary of Argument of Northwest's brief:

"II — The adjustments made by the Public Utilities Commission were neither just nor reasonable, constituted a denial of due process and resulted in the confiscation of the property of the Defendant in Error."

It is a fair appraisal of the record to say that all of the basic facts upon which the Commission's Decision No. 68272 is founded were furnished by Northwest from its records. Therefore, we do not have "disputed questions of fact." The disagreement arises over the treatment of those facts by the Commission in reaching its conclusion as to a fair and reasonable rate base.

Northwest has challenged the validity of the decision on the ground that it violates a right of petitioner under the United States Constitution or the constitution of the state of Colorado — confiscation of its property without just compensation, contrary to the fifth and fourteenth amendments to the United States Constitution; and also article II, section 15 of the constitution of the state of

Colorado. It therefore contends that as a result of these constitutional imperfections it was incumbent upon the district court, under C.R.S. 1963, 115-6-15(2), to "exercise an independent judgment on the law and the facts." This subsection further states that, under these circumstances, "the findings or conclusions of the commission material to the determination of the said constitutional question shall not be final."

C.R.S. 1963, 115-6-15 was enacted in 1913 and has remained unchanged since that date. Neither the briefs of the parties nor our research has disclosed a decision of this court dealing specifically with the language of the exception contained in subsection (2) empowering the court to "exercise an independent judgment on the law and the facts," where the constitutional issue of confiscation has been raised.

In support of its position, Northwest refers us to a 1919 decision of the United States Supreme Court, *Ohio Valley Water Company v. Ben Avon Borough*, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908. The case before us on its facts is not greatly dissimilar from *Ben Avon*.

In *Ben Avon*, the court said:

"Looking at the entire opinion we are compelled to conclude that the [state] Supreme Court interpreted the statute as withholding from the courts power to determine the question of confiscation according to their own independent judgment when the action of the Commission comes to be considered on appeal.

"The order here involved prescribed a complete schedule of maximum future rates and was legislative in character. *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210; *Lake Erie & Western R. R. Co. v. State Public Utilities Commission*, 249 U.S. 422, 424. In all such cases, if the owner claims confiscation of his property will result, the State must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts; otherwise the order is void because in conflict with the

due process clause, Fourteenth Amendment. *Missouri Pacific Ry. Co. v. Tucker,* 230 U.S. 340, 347; *Wadley Southern Ry. Co. v. Georgia,* 235 U.S. 651, 660, 661; *Missouri v. Chicago, Burlington & Quincy R. R. Co.,* 241 U.S. 533, 538; *Oklahoma Operating Co. v. Love,* 252 U.S. 331."

The Public Utilities Law was enacted by the Colorado General Assembly six years prior to *Ben Avon.* By strange coincidence the statute, in almost identical language to that used by the Supreme Court in *Ben Avon,* provided for the "independent" judgment of the reviewing court where "confiscation" was in issue. Because the statute was enacted prior to the *Ben Avon* decision, we conclude that C.R.S. 1963, 115-6-15 was not an attempt to codify *Ben Avon,* nor was the effect to engraft either the rule or the reasoning thereof into the law of Colorado.

We think 115-6-15 does "provide a fair opportunity for submitting that issue [confiscation] to a judicial tribunal for determination upon its own independent judgment as to both law and facts," in full compliance with *Ben Avon.* However, if *Ben Avon* requires the independent finding of facts by the court rather than the exercise of independent judgment on the facts, our statute as it has been applied is not in harmony with *Ben Avon.*

There have been countless federal cases since *Ben Avon* dealing with the question of confiscation resulting from rate orders of federal regulatory agencies. *Ben Avon* has not been expressly overruled, but neither has it been applied by the United States Supreme Court in more recent cases. *Alabama Public Service Commission v. Southern Railway Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002; *Railroad Commission of Texas v. Rowan & Nichols Oil Co.,* 311 U.S. 570, 61 S.Ct. 343, 85 L.Ed. 358; *Railroad Commission of Texas v. Rowan & Nichols Oil Co.,* 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368. Also, see

*St. Joseph Stockyards Co. v. United States,* 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033.

Thus it would seem that "due process" is something less than *Ben Avon,* so far as the United States Supreme Court is now concerned. Consequently, we have concluded that our problem involves an initial determination of the legislative intent, under the circumstances here, as to the mandate of 115-6-15(2) that

" * * * the district court shall exercise an independent judgment on the law and the facts, and the findings or conclusions of the commission material to the determination of the said constitutional question shall not be final. * * * "

Therefore, as we view it, the controversy resolves itself into the question as to what constitutes "independent judgment on the law and the facts." It is almost universally conceded that a court should "exercise an independent judgment on the law." In fact, this is conceded by the Commission here in its discussion of *Glenwood Light and Water Company v. City of Glenwood Springs,* 98 Colo. 340, 55 P.2d 1339. We, therefore, will concern ourselves primarily with what the legislative intent was when it imposed the duty on the district court upon review to "exercise an independent judgment on * * * the facts."

### STATUTORY SCHEME OF RATE REGULATION

To arrive at a conclusion on the question, a brief analysis of the statutory scheme of utility rate regulation is indicated. C.R.S. 1963, 115-3-1 provides that all rates charged by a public utility for any service rendered or to be rendered shall be just and reasonable. The power to determine such rates is delegated by the General Assembly to the Commission — it is a delegation of a part of its legislative power (115-3-2). *Wolverton v. Mountain States Tel. & Tel. Co.,* 58 Colo. 58, 142 P. 165. The Commission, after a hearing, "shall determine the just, reasonable or sufficient rates" (115-3-11), and, in doing so, "shall have power to ascertain the value of

the property of every public utility in this state and the facts which in its judgment have or may have any bearing on such value" (115-4-10).

In the provisions relating to "hearings," (115-6-9), we find that the legislature contemplated proceedings, judicial in character, with participation by all parties who might be "interested in or affected by" any order that may be made by the Commission. Most importantly, 115-4-10, which grants to the Commission the "power to ascertain the value of the property * * * and the facts which in its judgment have or may have any bearing on such value," contemplates a *full hearing on value,* which, of course, affords the utility its opportunity to present its evidence of value.

To preserve the evidence for judicial review the Act requires that a complete record be kept of all proceedings, including the testimony of all witnesses. At the conclusion of every formal hearing, "findings of fact and conclusions" shall be made and its order shall be entered by a written decision. Procedural provisions for objections, exceptions and court review are also spelled out in 115-6-9.

It is significant that power is reserved to the Commission to, "at any time upon notice to the public utility affected, and after opportunity to be heard as provided in the case of complaints, * * * rescind, alter or amend any order or decision made by it." 115-6-12.

The Act in 115-6-14 makes provision for review on rehearing which is comparable to a motion for new trial in judicial proceedings, and is, of course, a prerequisite to the judicial review provided for in 115-6-15.

From the foregoing review of the statutory provisions we are persuaded that the legislature clearly intended to place the primary duty and responsibility for the determination of just and reasonable utility rates in the Commission, and provided a rather complete procedural structure for the Commission to follow in discharging its function.

■ From the above it is abundantly clear that the legislature did not intend that there be a trial *de novo,* in its broadest sense, regardless of what the issue might be.

■■ The next question is, did the legislature, where a constitutional question is interjected, intend to empower the court to conduct a complete *de novo* investigation of the rates based *upon the record* made before the Commission, or did it intend a different approach? We do not believe that the legislature contemplated that the court, without the aid of a staff and the expertise of the Commission, should undertake to duplicate the evaluation and judgment processes followed by the Commission in arriving at its decision.

On this point, 4 K. Davis, Administrative Law Treatise § 29.10, states:

" * * * If the function performed by an agency is 'administrative' or 'legislative,' and if a federal court is required to do all over again what the agency has done, the system of review violates Article III of the Constitution [United States Constitution]."

We think this philosophy is sound, is consistent with the corresponding provisions of the Colorado constitution, and comports with the contemplation of the legislature as expressed in C.R.S. 1963, Chapter 115, and in nowise infringes on the separation of powers doctrine.

■■ This court, in *Colorado Telephone Company v. Wilmore,* 53 Colo. 585, 129 P. 204, held that the courts have no power to fix rates, because the fixing of rates is a *legislative* function, rather than a *judicial* function. Obviously, courts should not arrogate unto themselves the performance of nonjudicial activities.

■ The court, unless clearly and unequivocally empowered by legislative mandate, should not invade areas of legislative discretion primarily left to the Commission by entering an order which it deems the Commission *ought* to have made. *Keller v. Potomac Electric Power Co.,* 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731.

■ K. Davis, Administrative Law Treatise, *supra,* suggests that,

" * * * The substitution of judgment on fact and law is one thing; the entry of the right order is another. * * * Rate fixing involves more than finding facts and applying them; it also involves many questions of judgment or discretion. The task of the agency in working out the subordinate legislative policies about rate fixing is a task that should not be assigned to the courts." We agree. The framework of the legislative act creating the Commission and providing for the rate making procedures clearly indicates that rate making in Colorado has been delegated to the Commission and not the courts.

In determining the legislative intent in reference to review of Commission orders, we cannot safely attempt to derive the whole meaning from the language employed solely in the *exception* which we have been discussing. We must look to the balance of 115-6-15 as it applies to review in those situations where constitutional issues are not raised.

■ "An independent judgment on the law" is exercised in the context of this discussion when the court "determines whether the Commission has regularly pursued its authority." This would involve, among other matters, whether the decision is based upon the evidence introduced before the Commission at the hearing; whether its order is supported by findings of fact; *Interstate Commerce Commission v. Louisville and Nashville Railroad Co.,* 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431; *West Ohio Gas Co. v. Public Utilities Commission of Ohio,* 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761; *Acker v. United States,* 298 U.S. 426, 56 S.Ct. 824, 80 L.Ed. 1257; whether the Commission applied the legislative standards set forth for the guidance of the Commission; and whether the Commission acted within the authority conferred or went beyond it. As we view it, compliance with the "independent judgment on the law" phase of the review process is basically met when the court has

satisfied itself as to the pertinent demands of procedural and substantive *due process*. All of these determinations by the trial court must appear in its findings. The type of review contemplated is that almost universally employed by state and federal appellate courts under the guidance of decisions of the United States Supreme Court. *Western Buse T. Co. v. Northwestern Bell Tel. Co.*, 188 Minn. 524, 248 N.W. 220; *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598; *St. Joseph Stockyards Co. v. United States*, 298 U.S. 38, 56 S.Ct. 720, 80 L. Ed. 1033; *Federal Radio Commission v. Nelson Bros. Co.*, 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406; *Federal Communications Commission v. Schreiber*, 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383.

 What constitutes "an independent judgment on the * * * facts" is somewhat less clear than the *law* question. However, as we interpret 115-6-15, the exercise of *"an independent judgment on the * * * facts"* is something other than *the making of independent findings of fact*. This is necessarily so because, as we pointed out above, fact determination in rate making necessarily contains policy ingredients.

In the light of the fact that we have held that the rate making function is *legislative*, it would be completely inconsistent for this court to approve the action of the trial court in making independent *findings of fact*, when, by statute, it is the duty of the Commission to make findings of fact as a basis for its rate order. Unless the trial court is to duplicate the Commission's function the intendment of the statute must be that the court perform some function other than independently "find" facts when it "exercises its independent judgment on the facts."

 Therefore, from a review of the decisions of this court and the United States Supreme Court, we conclude that the court's responsibility is fulfilled as to this facet when it determines, by the exercise of its judgment, that the administrative findings of fact have

a legally adequate basis in the evidence. *Consolidated Freightways v. P.U.C.*, 158 Colo. 239, 406 P.2d 83; *P.U.C. v. Verl Harvey, Inc.*, 150 Colo. 158, 371 P.2d 452; *Denver v. People ex rel. P.U.C.*, 129 Colo. 41, 266 P.2d 1105; *St. Joseph Stockyards Co. v. United States*, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033; *Tagg Bros. & Moorhead v. United States*, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524. Also see *Southern Pacific Co. v. P.U.C.*, 41 Cal.2d 354, 260 P.2d 70.

In *Consolidated Freightways, supra,* this court observed:

"This section [115-6-15] contemplates there be in the Commission's files some *evidence* to support a decision and order which the courts can review and which will enable the court intelligently to determine whether the Commission has exceeded its jurisdiction, abused its discretion, *and whether its order and decision is warranted by the facts. * * * * "* (Emphasis added.)

Although the court did not say so, the import of the above quotation from *Consolidated Freightways* is that when the court has made the contemplated "review" it will have exercised "an independent judgment on the law and the facts."

Mr. Chief Justice Hughes, on the scope of judicial review, in *St. Joseph Stockyards Co. v. United States, supra,* stated:

"But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be greatly facilitated by the assembling and analysis of the facts in the course of the legislative determination. Judicial judgment may be nonetheless appropriately independent because informed and aided by the sifting procedure of an expert legislative agency. Moreover, as the question is whether the legislative action has passed beyond the lowest limit of the permitted zone of reason-

ableness into the forbidden reaches of confiscation, judicial scrutiny must of necessity take into account the entire legislative process, including the reasoning and findings upon which the legislative action rests. We have said that 'in a question of ratemaking there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing.' *Darnell v. Edwards*, 244 U.S. 564, 569. The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established. *Los Angeles Gas Corp. v. Railroad Commission*, 289 U.S. 287, 305; *Lindheimer v. Illinois Telephone Co.*, 292 U.S. 151, 169; *Dayton Power & Light Co. v. Public Utilities Comm'n*, 292 U.S. 290, 298."

We adhere to the rule of law stated in *Consolidated Freightways, supra*, and we supplement that ruling by adopting the language borrowed from the *Stockyards* case.

### RATE BASE ADJUSTMENTS

The Commission, in Assignment of Error II, asserts the affirmative of the proposition to be resolved, whereas *Northwest* claims to the contrary that,

"The adjustments made by the Public Utilities Commission were neither just nor reasonable, constituted a denial of due process and resulted in the confiscation of the property of the Defendant in Error."

(It should be noted that Northwest does not claim it was denied an opportunity to present its evidence of value.)

A basic area of disagreement exists between the parties as to the proper treatment to be accorded certain exhibits prepared by the technical staff of the Commission. One exhibit (No. 2) purported to be a rate base for the year 1964 and the year ending September 30, 1965. This rate base consisted of plant in service,

prepayments, and working capital, less the depreciation reserve. The figures used were an exact reflection of the books and records of Northwest.

In the discussion portion of its order relating to "rate base" the Commission stated:

"For the purpose of this decision, the form of the rate base as shown on Staff Exhibit No. 2 will be used but adjustments will be made to this exhibit to arrive at the proper rate base."

Northwest argues that since the staff "verified" the figures shown in its Exhibit No. 2 by an examination of Northwest's books, and since those were the only "figures" before the Commission, it must accept and use them at face value.

The trial court by that part of its judgment dated June 19, 1967, attempted to conform the rate order to the undisputed figures contained in Exhibit No. 2, whereas the Commission, although using the same information, did not accept all of it at face value. It is these deviations from face value which the trial court, in its judgment of June 19, 1967, sought to correct, and which give rise to the controversy we must now resolve.

A simple resolution to this particular bone of contention is to point out that rate making is not an exact science. Those charged with the responsibility of prescribing rates have to consider the interests of both the investors and the consumers. Sound judgment in the balancing of their respective interests is the means by which a decision is reached rather than by the use of a mathematical or legal formula. After all, the final test is whether the rate is "just and reasonable." And, of course, this test includes the constitutional question of whether the rate order "has passed beyond the lowest limit of the permitted zone of reasonableness into the forbidden reaches of confiscation." *Consolidated Freightways v. P.U.C., supra; St. Joseph Stockyards Co. v. United States, supra; Re Chesapeake & Potomac Telephone Co.,* 6 P.U.R.3d 222.

The first modification to Staff Exhibit No. 2 made by the Commission in Decision No. 68272 was to reduce the gross rate base as shown by Exhibit No. 2.

The Commission made three adjustments to "Plant in Service" consisting of the following items:

| | | |
|---|---|---:|
| (1) | Arapahoe Well #7 no longer used or useful | $ 6,505 |
| (2) | Contributions by builders (40 year notes) | 136,820 |
| (3) | Water rights held for future use | 82,951 |
| | | $226,276 |

These adjustments reduced the gross rate base from $560,142 to $333,866.

Exhibit No. 2 showed a "deduction" of "Depreciation Reserve" in the amount of $72,355. Consistent with adjustments (1) and (2) above, the Commission amended the depreciation reserve figure by deductions (4) and (5):

| | | |
|---|---|---:|
| "Depreciation Reserve — | | $72,355 |
| "[Less:] | | |
| "(4) | Adjusted for deletion of well #7 | 2,070 |
| "(5) | Adjusted for contribution by builders | 7,886 |
| | | $62,399" |

The trial court, in its judgment of June 19, 1967, agreed with the Commission as to items (1) and (4), the treatment of Well No. 7, but disagreed with the Commission as to items (2) and (5), the adjustments relating to the contributions by the builders, and item (3) relating to water rights held for future use.

*Adjustments (1) and (4)*

Although Northwest was generally in accord with the treatment it received at the hands of the district court, it takes issue with its failure to upset the Commission's findings as to Well No. 7. In its brief, Northwest concedes that it may have misled the trial court by suggesting in oral argument that there was a conflict in the evidence in reference to this well, which, of course,

would deprive the court of its right to *exercise its independent judgment on the facts.* C.R.S., 1963, 115-6-15. However, in this court it claims that there is no conflict in the evidence; that the state of the record is such that the Commission had no choice but to include the cost of the well in the rate base.

The record discloses that the well had been out of service for some period of time prior to the hearing for various reasons, the principal one being that the treatment facilities lacked capacity to process any additional water, which is discussed in reference to adjustment (3). This is a sufficient reason to justify the Commission's present refusal to regard the well as used and useful. Upon a change of circumstances Northwest may apply to the Commission for proper relief.

*Adjustments (2) and (5)*

The exclusion from the rate base of the cost of water service lines installed by builders and developers, which are then transferred to the water utility in order to obtain water service for their houses, is a generally recognized practice and legally permissible. *City of Hagerstown v. Public Service Commission of Maryland,* 217 Md. 101, 141 A.2d 699, 24 P.U.R.3d 295; *Public Utilities Commission v. East Providence Water Co.,* 48 R.I. 376, 136 A. 447; *City of St. Francis v. Public Service Commission,* 270 Wis. 91, 70 N.W.2d 221; *Sutter Butte Canal Co. v. Railroad Commission of California,* 202 Cal. 179, 259 P. 937; *Pichotta v. City of Skagway,* 78 F.Supp. 999.

The rationale of the Commission in relation to adjustments (2) and (5) is clearly stated in this language from its decision:

"The builders who constructed houses in the area built certain distribution lines to furnish service to the houses they constructed and these, in turn, were sold to Northwest. In exchange for these facilities, Northwest gave unsecured promissory notes due and payable at maturity in 40 years with interest at 6%, also payable

at maturity. * * * [The notes were made payable to a (1) subdivider and developer, (2) a mortgage banker and subdivider, and (3) a construction company owned by the sole owners of Northwest.]

"The properties conveyed to Northwest on consideration of these notes should be treated as properties contributed by the builders. * * * "

It will be noted that the Commission made no specific findings as to whether (1) the builders and developers recovered their costs of water line installation from the purchasers of their houses; (2) whether there was any agreement between the builders and the water company which would negate consideration for the amounts represented by the notes; or (3) that the notes were fictitious, having been given for the sole purpose of building up the rate base, or, perhaps, some other valid reason justifying the treatment accorded the notes.

The statement by the Commission that "the properties conveyed to Northwest on consideration of these notes should be treated as properties contributed by the builders," is not a finding of fact but a conclusion of law.

The Commission, upon remand, shall make further findings in respect to this phase of the case and, in the event the evidence in its files is not sufficient upon which to base its findings, it may, upon proper notice, conduct a further evidentiary hearing to determine whether the facts support its conclusion as to the contribution.

### Adjustment (3)

Adjustment (3) is explained by the Commission in this language from its decision:

"Applicant [Northwest] has acquired as its principal source of water, a water right in the Platte River. This water right has been adjudicated by the Court and Applicant is entitled to use 5.3 cubic feet of water per second. This means that Applicant has available to it over 3,400,000 gallons a day from this source. Applicant's water treatment plant capacity at the end of the

test period was capable of producing 1,080,000 gallons per day. Based upon the present plant capacity and the amount of water available in the held right, Applicant can presently utilize 31.5% of its water right. Accordingly, we shall adjust the rate base by the amount of water right held for future use. * * * "

Adjustment (3), deducting $82,951 from "Plant in Service," represents that part of the water right which was not, at the time of Decision No. 68272, "used or useful" (68.5%), but which will be available for use if and when Shaw Heights is fully built up. Because of the capacity of the water treatment facilities only 31.5% of the water right could be utilized by Northwest at the time of the decision. Nevertheless, the loss of a return on 68.5% of an investment of $121,000 might, but not necessarily, amount to "confiscation." On this phase of the case, Northwest asserts:

"1. One of the conditions imposed by the Commission upon Northwest Water Corporation when it granted Northwest Water Corporation its Certificate of Public Convenience and Necessity was 'that Northwest Water Corporation shall continue its efforts heretofore commenced to obtain surface water and thereby insure continuity of water supply into the indefinite future; and should it fail in such attempts shall obtain such surface water from other sources'."

The above quoted language, when read in the context of the record, does not have quite the implication which Northwest suggests in its statement nor in its argument which follows. Regardless, a stable supply of water for the certificated area was necessary. Prior to its efforts to acquire the water right in question and convert it from an agricultural use to domestic use and change the point of diversion, it had obtained its water supply from eight deep wells. It was apparent to the Commission from the record that these wells were not capable of furnishing either an adequate or firm supply of water for the whole of the certificated area, so, consequently,

it refused to issue the requested certificate of convenience and necessity. Northwest, in order to remedy this deficiency and obtain its Certificate of Public Convenience and Necessity, purchased the water right which is now in controversy. The Commission, in order to protect those who had bought and those who, in the future, would buy houses in the area on the representation that there was a stable water supply, conditioned the granting of the certificate on the acquisition of an adequate source of surface water.

There is nothing in the record to indicate that consideration was given to the divisibility of the water right, and, if divisible, what financial benefits might accrue to Northwest by virtue of its division. It is common knowledge that water rights in the South Platte River basin, because of their extreme scarcity, are very valuable. It is inconceivable that a utility such as Northwest could go into the market and purchase adjudicated water rights to fill its needs on a year to year basis as those needs developed. It seems to us, under these circumstances, unjust to penalize a utility company for its foresight in acquiring a guaranty of water to meet its constantly increasing needs. On the other hand, until all other alternatives are explored, it would be unjust to place upon the present customers (831) of the utility the full burden of the investment in the excess water. This is especially true where, as here, the owners of the utility are also the owners and developers of the land which will be sold to and used by the ultimate consumers of that which is now *excess water*. See *Re Cascade Town Co.,* 41 P.U.R.3d 256.

Under the circumstances of the record before us, the strict application of the "used and useful" rule might conceivably operate to confiscate Northwest's property without just compensation. However, because of our general adherence to the "used and useful" rule and the potential unfairness to the present consumers, we are remanding the case to the Commission to determine

whether or not the use of the water right is divisible; that is, can the unused 68.5% of the available water be sold on a year to year basis? And, if it can, will the annual sale of the use of that quantity of water provide a reasonable return under the circumstances here on the $82,951 investment in the interval before its use is required in the certificated area? The Commission should also determine, as of this time, whether there are reasonable grounds to believe that the entire water right will be needed by Northwest when the certificated area reaches its ultimate development. If not, the Commission should consider the desirability of authorizing Northwest to sell or lease on a permanent basis the unneeded portion of its water right. To the extent that the sale, if feasible, of the presently unused water fails to provide a reasonable return on Northwest's investment in the water right, the Commission should determine how the deficiency may be divided equitably between the utility and the consumers. By this action we are not overruling the general rule as to "used and useful." However, if, after a further hearing on this point, it develops that the presently unused water will produce little or no income, then the Commission, in the first instance, should determine to what extent, if any, the exclusion of its cost from the rate base amounts to confiscation.

We do not hold that under no circumstances can property or equipment acquired in anticipation of reasonable future need be considered in the rate base. It is the somewhat unique situation with which we are confronted here, where the landowner-developer is the owner-operator of the utility, that calls for such intense scrutiny before the "used and useful" rule is applied. See *Pacific Tel. & Tel. Co. v. Wallace,* 158 Ore. 210, 75 P.2d 942.

### RATE OF RETURN

The Commission allowed Northwest a 5% rate of return on the adjusted rate base. Northwest contends that this is unreasonable, confiscatory, and not supported

by the evidence. The trial court did not disturb this determination.

The statutory guide to the Commission in establishing rates is provided by C.R.S. 1963, 115-6-11, which merely admonishes the Commission that the rates be "just and reasonable."

In Decision No. 68272 the Commission, in reference to the rate of return, stated:

"The determination of rate of return must be made by considering, among other things, the degree of risk involved on the part of the investors.

"The Applicant has shown that through various devices, it is able to reduce the investor's risk. The granting of a certificate of public convenience and necessity carries with it a certain amount of protection from competition. Applicant has gone further, however, to immunize from competition by inserting a protective covenant restricting residents of Applicant's certificated area from (1) drilling a well on his property and (2) forming a Water District or annexing to a municipality without the express consent of the Applicant so long as Applicant provides water service to these domestic users. It is, therefore, clear that although a domestic user of water normally has certain indirect alternatives to his basic supply of water, in this case those alternatives are no longer available. Applicant has therefore solidified its position and reduced the risk of its capital investors to a considerable degree.

"A 5% rate of return on the rate base is reasonable and will enable Applicant to maintain its plant and equipment, pay fixed charges on the plant used and useful for the service to existing customers, with a commensurate return to the stockholders in accordance with its present development."

The utility is entitled to a reasonable return on the value of the property which is used and useful to the rendering of its service to the public. *Glenwood Light & Water Co. v. City of Glenwood Springs,* 98 Colo.

340, 55 P.2d 1339; *Ohio & Colorado Smelting & Refining Co. v. P.U.C.,* 68 Colo. 137, 187 P. 1082; *The Minnesota Rate Cases,* 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511; *Pacific T. & T. Co. v. Wallace,* 158 Ore. 210, 72 P.2d 942; *State v. Tri-State Tel. & Tel. Co.,* 204 Minn. 516, 284 N.W. 294. By the same token, the monopoly which the utility enjoys cannot be exerted to the public detriment to impose oppressive rates.

▇▇▇ The determination of the *rate of return,* like the fixing of rates, involves many questions of discretion and judgment, which, as we pointed out above, is the task of the Commission and not the courts. So, if the findings of fact on which the rate of return is founded have a legally adequate basis in the evidence and pass the constitutional tests heretofore outlined, the courts cannot disturb the Commission's determination.

### WESTMINSTER CONTRACT

In a part of its Decision (No. 68272) entitled "Income and Expense" the following appears:

"Applicant submitted at the hearing its Exhibit No. 2 showing income and expenses for the year 1964 and for the nine months ending September 30, 1965. This exhibit reflects an income loss for the year 1964 in the amount of $10,633, and for the nine months ending September 30, 1965 an amount of $46,312. It will be noted that between the end of 1964 and the end of the nine months period on September 30, 1965, applicant shows a decrease in revenue amounting to $50,029. Applicant had a contract to sell water to the Town of Westminster, but the Town of Westminster is no longer purchasing water from applicant and, therefore, there has been a considerable decrease in operating revenues. * * * This sale has been terminated as a result of court action [district court] by the Town in regard to the contract and applicant can no longer expect this source of revenue."

The court action referred to was pending review in this court at the time of the Commission's decision and also at the time when the District Court of Arapahoe

County rendered its judgments. However, on October 23, 1967, this court reversed and remanded that case to the trial court with direction to reinstate the contract and to grant a trial on the issue of damages. See *Northwest Water Corporation v. City of Westminster*, 164 Colo. 61, 432 P.2d 757. This litigation should be terminated soon and its effect upon the rates as determined in Decision No. 68272 will then be a matter for the initial determination of the Commission. Consequently, this phase of the case shall be considered by the Commission upon remand.

This cause is remanded to the district court with direction to vacate its judgments of June 9 and 19, 1967, to set aside Decision No. 68272 of the Commission and remand the cause to the Commission with direction for further proceedings consonant with the views expressed herein.

MR. JUSTICE HODGES and MR. JUSTICE LEE not participating.