2012 CO 53

**Leslie W. GLUSTROM, Petitioner–Appellant**

v.

**COLORADO PUBLIC UTILITIES COMMISSION, Respondent–Appellee**

and

**Public Service Company of Colorado, Intervenor.**

**No. 11SA164.**

Supreme Court of Colorado, En Banc.

June 25, 2012.

Dennis J. Kelly, Greenwood Village, Colorado, Highlands Ranch Law Center P.C.,

Anne Whalen Gill, Highlands Ranch, Colorado, Attorneys for Petitioner–Appellant.

John W. Suthers, Attorney General, Michael J. Santisi, Assistant Attorney General, Denver, Colorado, Attorneys for Respondent–Appellee.

Dudley P. Spiller, P.C., Dudley P. Spiller, Denver, Colorado, Attorneys for Intervenor.

Justice EID delivered the Opinion of the Court.

¶ 1 With the approval of the Public Utilities Commission ("PUC"), in 2005 the Public Service Company of Colorado ("Xcel") began constructing a coal-fired electric power unit known as Comanche 3. When Xcel sought to recover a portion of its construction costs nearly four years later in a rate proceeding, Leslie Glustrom intervened. Glustrom sought to introduce testimony that Xcel acted improperly and, consequently, should not recover its costs. The PUC excluded most of her testimony, a ruling that Glustrom challenged. Glustrom separately challenged the depreciation rate and the possibility that Comanche 3 might not be "used and useful" at the time rates went into effect. The PUC denied her challenges, and the district court affirmed. We likewise affirm.

¶ 2 We find that the PUC did not abuse its discretion when it struck substantial portions of Glustrom's testimony pursuant to the Colorado Rules of Evidence. Further, the depreciation rate approved by the PUC was established pursuant to law and in accordance with the evidence. Lastly, the PUC was free to exercise its discretion in departing from a strict application of the "used and useful" principle. Glustrom failed to meet her burden in showing why such a departure here would result in a rate that is unjust and unreasonable in its consequences.

## I.

¶ 3 In 2004 Xcel filed an application with the PUC seeking to construct Comanche 3.[1] The PUC held formal hearings with the intervening parties and also accepted public comments. Prior to the conclusion of the hearings, many of the parties reached a comprehensive settlement, which included a separate settlement with additional environmental groups concerning pollution. The PUC ultimately approved the comprehensive settlement, granting Xcel a Certificate of Public Convenience and Necessity (a "CPCN").[2] The settlement provided that Xcel would recover its construction costs by increasing electricity rates through the utility rate base.

¶ 4 On June 19, 2008, Glustrom filed a motion requesting that the PUC reconsider whether Comanche 3 was in the public interest.[3] Specifically, Glustrom asked the PUC to withdraw its CPCN for Comanche 3. She argued that since the approval of Comanche 3, "everything ha[d] changed dramatically—from the governance and philosophy of Xcel to the climate change goals of Colorado to the cost and accessibility of coal." Primarily, she argued that Comanche 3 "doesn't have a secure supply of [coal.]" She also argued that Comanche 3 would "contribute massive amounts of unnecessary pollution to the environment of our state, country and planet." This unnecessary pollution, Glustrom claimed, makes Xcel "an easy target" for legal claims related to climate change, mercury toxicity, "and several other health and environmental problems."

¶ 5 Xcel filed a motion to dismiss Glustrom's motion as an improper collateral attack on a final PUC decision, and Glustrom filed a reply.

¶ 6 On July 16, 2008, the PUC denied Xcel's motion to dismiss, finding that, under section 40–6–112(1), C.R.S. (2011), the PUC possessed the authority to reconsider its pri-

---

1. This application was filed in what became the consolidated docket of Docket No. 04A–214E, Docket No. 04A–215E, and Docket No. 04A–216E. The consolidated docket addressed Xcel's application for (1) a Certificate of Public Convenience and Necessity, (2) approval of its least cost resource plan, and (3) approval of its regulatory plan to support its least cost resource plan.

2. Decision No. C05–0049.

3. This motion was filed in the consolidated docket of Docket No. 04A–214E, Docket No. 04A–215E, and Docket No. 04A–216E.

or CPCN decision.[4] Even though it possessed the authority to reconsider Comanche 3's CPCN, however, the PUC chose not to do so. The PUC found that although "the sentiment towards coal and the economy may have changed since [granting a CPCN for Comanche 3]," its decisions reflect that underlying factors "are not static." Here, the PUC felt that the issues raised by Glustrom regarding "energy prices, the environment, health, and her other points were fully assessed by the [PUC] during the Comanche 3 proceedings." Consequently, the PUC found "no need to reopen and reassess the Comanche 3 construction."

¶ 7 In November 2008 Xcel sought to recover $174.7 million, including a portion of the Comanche 3 construction costs, through an increase in electricity rates.[5] The PUC determined it would hold a formal evidentiary hearing on the increase and invited interested parties to intervene. Eighteen parties, including Glustrom, intervened, representing a wide range of interests.

¶ 8 In support of the rate increase, on November 14, 2008, Xcel's Director of Capital Asset Accounting submitted testimony supporting a 60–year depreciation life for Comanche 3. She stated that "[t]he depreciable life for [Comanche 3] is based on the whole life that was established for the other units at the respective generating stations because the expectations for useful life are the same." The "other units" are Comanche 1 and Comanche 2, which are part of the same power station as the proposed Comanche 3, and, like Comanche 3, are coal-fired electric power units. She also noted that a depreciation study was completed, she described the process used to complete the study, and she included detail worksheets and other supporting information.

¶ 9 On February 13, 2009, Glustrom filed testimony, which included over 100 exhibits. In her testimony, Glustrom argued that Xcel was not entitled to recover all its costs for Comanche 3 because, under PUC Rule 3613(d), circumstances had changed and Xcel's continued expenditures on Comanche 3 were improper. 4 Colo.Code Regs. § 723–3:3613(d) (2009).[6] Without specifying when Xcel's expenditures became improper, Glustrom primarily alleged the following changed circumstances: (1) the coal supply has been shown to be insufficient to meet Comanche 3's needs; (2) climate change has become "extremely serious and ... threatens the planet as we know it"; and (3) impending legal changes will make coal-related pollution more costly (and thus makes other energy sources more feasible now).

¶ 10 Xcel filed a motion to strike a substantial portion of Glustrom's testimony, and Glustrom filed a response. On March 18, 2009, the administrative law judge ("ALJ") granted Xcel's motion to strike.[7] The ALJ characterized Glustrom's argument as primarily being that Xcel was required, and failed, to demonstrate a coal supply for the life of Comanche 3. The ALJ found that Glustrom "fail[ed] to demonstrate the relevancy of the argument or the necessary foundation of any such requirement." Further, the ALJ noted that just six months before, in response to Glustrom's motion requesting the PUC to reconsider Comanche 3, the PUC had found that Glustrom's arguments had been "fully assessed by the [PUC] during the [initial] Comanche 3 proceedings." The ALJ found that Glustrom had presented procedurally proper arguments when she requested the PUC to reconsider Comanche 3 six months earlier, but her arguments were "now outside the scope of (and thus not relevant to) this proceeding." [8]

4. Decision No. C08–0955.

5. Docket No. 08S–520E.

6. At the time of this case, Rule 3613(d) stated that "[i]n a proceeding concerning the utility's request to recover the investments or expenses associated with new resources," in order to support disallowing the recovery of investments or expenses, an intervenor "may present evidence that, due to changed circumstances timely known to the utility or that should have been known to a prudent person, the utility's actions were not proper." 4 Colo.Code Regs. § 723–3:3613(d).

7. Decision No. R09–0293–I, clarified in Decision No. R09–0373–I.

8. On January 14, 2009, the ALJ had granted an unopposed motion by Xcel to limit the scope of the docket. Excluded from the scope of the

¶ 11 On April 22, 2009, Xcel and certain other parties filed a settlement agreement to settle the rate case, agreeing to a $112.2 million rate increase, which included a portion of Comanche 3's construction costs.[9] The PUC held a formal hearing and received public comments on the settlement. Glustrom and two other parties opposed the settlement. Glustrom argued that the settlement violated the "used and useful" principle because it (1) included costs of Comanche 3, estimated to be in service in November, into rates that begin in July; and (2) failed to include a mechanism adjusting rates if Comanche 3's in-service date was delayed. Glustrom also opposed the settlement's 60–year depreciation life for Comanche 3 and requested that the PUC reconsider the ALJ's decision to strike her testimony.

¶ 12 On June 9, 2009, the PUC approved the settlement.[10] The settlement provided for an increase in rates for approximately six months, starting in July 2009 and ending in December 2009, when Xcel hoped to have new rates in effect. The PUC found that the settlement "will result in rates that are just and reasonable," and that the settlement reflected a "meaningful reduction in the proposed rates compared with [Xcel's] initial case." The PUC noted that the construction of Comanche 3 was slightly behind schedule, and that the settlement contained "no automatic adjustment mechanism ... that would trigger adjustments to the rates if the in-service date for Comanche 3 differs from the assumed date in the [s]ettlement," November 1, 2009. Notwithstanding, at that time, the PUC was not concerned about the lack of an adjustment mechanism. The PUC found that "[i]f the in-service date is significantly different than planned, [it] would investigate the appropriate action at that time. Such action could include revisiting the issue in Docket No. 09AL–299E or in another type of

proceeding." By approving the settlement, the PUC approved the 60–year depreciation life. Further, the PUC refused to revisit the ALJ's order excluding Glustrom's testimony.

¶ 13 Due to construction delays, Comanche 3 was not placed in service on November 1, 2009, as assumed. Instead, it went in service in the spring of 2010.[11] As contemplated, the PUC considered the construction delay in Docket No. 09AL–299E, but did not reopen rates resulting from this docket,[12] which went into effect as planned on July 1, 2009.

¶ 14 Following the PUC's decision, Glustrom twice requested that the PUC modify its decision, which the PUC rejected.[13] The district court affirmed, and Glustrom appealed.

**II.**

¶ 15 Glustrom challenges three rulings by the PUC.[14] First, Glustrom argues that the PUC erred when it struck large portions of her testimony. Second, Glustrom argues that the PUC erred when it set a 60–year depreciation life. Lastly, Glustrom argues that the PUC erred by allowing Xcel to include its Comanche 3 construction costs in its rates before Comanche 3 became "used and useful." We address each argument in turn.

**A.**

¶ 16 Glustrom argues that the PUC erred when it struck large portions of her testimony. PUC Rule 3613(d), she claims, "gave [her] the right to present evidence" that "circumstances had changed sufficiently to make [Xcel's] completion of Comanche 3 no longer proper." We disagree.

¶ 17 When the PUC holds formal hearings, those hearings are judicial in their

---

docket was evidence regarding, among other things, (1) a collateral attack on prior PUC decisions approving generation resources and (2) environmental costs or externalities associated with the use of fossil fuels.

9. This amount reflected 2/13ths of Comanche 3's plant in-service balance.

10. Decision No. C09–0595.

11. Glustrom states that Comanche 3 went into service in May, while Xcel states that it went into service in June.

12. Decision No. C09–1446.

13. Decision Nos. C09–0787 and C09–0921.

14. Glustrom challenges Decision Nos. C09–0595, C09–0787, and C09–0921.

procedural character. *Pub. Utils. Comm'n v. Nw. Water Corp.*, 168 Colo. 154, 167, 451 P.2d 266, 272 (1969). Consequently, as we would review a district court's evidentiary rulings, we review the PUC's evidentiary rulings for an abuse of discretion. Thus we will not disturb a PUC evidentiary ruling unless it is "manifestly arbitrary, unreasonable, or unfair." *E–470 Pub. Highway Auth. v. The 455 Co.*, 3 P.3d 18, 23 (Colo.2000). This standard is consistent with the deferential standard of review that we apply generally to PUC decisions. *See Pub. Serv. Co. v. Trigen–Nations Energy Co.*, 982 P.2d 316, 322 (Colo.1999) (limiting review of PUC decisions to "whether [the PUC] has regularly pursued its authority, whether the decision is just and reasonable, and whether the conclusions reached are in accordance with the evidence").

¶ 18 Under the PUC's rules, the PUC's hearings "shall" conform, to the extent practicable, to the Colorado Rules of Evidence applicable in civil nonjury cases. 4 Colo. Code Regs. § 723–1:1501(a) (2009); *see also* § 24–4–105(7), C.R.S. (2011) (expressing the same rule when agency hearings are required by law). But the PUC "may receive and consider evidence not admissible under [the rules of evidence] if such evidence possesses probative value commonly accepted by reasonable and prudent persons in the conduct of their affairs." 4 Colo.Code Regs. § 723–1:1501(a); *see also* § 24–4–105(7).

¶ 19 When Glustrom submitted her testimony, PUC Rule 3613(d) stated that, "[i]n a proceeding concerning the utility's request to recover the investments or expenses associated with new resources," in order to support disallowing the recovery of investments or expenses, an intervenor "may present evidence that, due to changed circumstances timely known to the utility or that should have been known to a prudent person, the utility's actions were not proper." 4 Colo. Code Regs. § 723–3:3613(d).

¶ 20 Contrary to Glustrom's argument, however, nothing in Rule 3613 suggests that she had an absolute right to present evidence before the PUC. Instead, Rule 3613 must be read in context with the other evidentiary provisions governing PUC hearings. In other words, any evidence presented under Rule 3613, like evidence presented generally in PUC hearings, "shall" conform, to the extent practicable, to the Colorado Rules of Evidence applicable in civil nonjury cases. 4 Colo.Code Regs. § 723–1:1501(a).

¶ 21 Glustrom's proffered testimony was properly excluded under those rules for at least two reasons. Here, Glustrom primarily alleged the following changed circumstances: (1) the coal supply has been shown to be insufficient to meet Comanche 3's needs; (2) climate change has become "extremely serious and ... threatens the planet as we know it"; and (3) impending legal changes will make coal-related pollution more costly (and thus makes other energy sources more feasible now). This testimony was substantially identical to the testimony that she had presented to the PUC just six months before. It was well within the PUC's discretion to exclude such testimony as duplicative and unnecessary. *See* § 24–4–105(7) (agencies, when required by law to hold hearings, are authorized to exclude "incompetent and unduly repetitious evidence"); CRE 403 (even relevant evidence "may be excluded if its probative value is substantially outweighed ... by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

¶ 22 In addition, Glustrom's proffered testimony involved subjects properly addressed by expert testimony. *See People v. Rincon*, 140 P.3d 976, 982 (Colo.App.2005) ("[A] person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." (quotations omitted)); CRE 702 (authorizing admission of expert testimony by a witness who the court "qualifie[s] as an expert by knowledge, skill, experience, training, or education"). Yet Glustrom presented no such expert qualifications to the PUC. And although the PUC could have accepted Glustrom's testimony if it found her testimony to possess "reliable probative value commonly accepted by reasonable and prudent persons in the conduct of their affairs," it was not required to do so. 4 Colo.Code Regs. § 723–1:1501(a) (stating

that the PUC "may" consider such evidence); *see also* § 24–4–105(7) (same).

¶ 23 Consequently, we find that the PUC did not abuse its discretion when it struck substantial portions of Glustrom's testimony pursuant to the Colorado Rules of Evidence.

### B.

¶ 24 Next, Glustrom argues that the PUC erred by permitting a 60–year depreciation life for Comanche 3. She argues that, under section 40–4–112, C.R.S. (2011), and the PUC's regulations, the PUC was required to conduct and submit a separate depreciation study for Comanche 3. Glustrom also argues that the adoption of the 60–year depreciation life was not in accordance with the evidence. We disagree.

¶ 25 We review questions of statutory construction de novo. *Eddie's Leaf Spring Shop & Towing LLC v. Pub. Utils. Comm'n,* 218 P.3d 326, 330 (Colo.2009). When reviewing whether a PUC decision is in accordance with the evidence, we view the evidence in the light most favorable to the PUC, *Trans Shuttle, Inc. v. Pub. Utils. Comm'n,* 89 P.3d, 398, 403 (Colo.2004), and we may not substitute our judgment for the PUC's when substantial evidence exists to support the PUC's findings and conclusions, *Trigen–Nations Energy Co.,* 982 P.2d at 322. Substantial evidence is enough evidence "to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Pub. Serv. Co. v. Pub. Utils. Comm'n,* 26 P.3d, 1198, 1205 (Colo.2001) (quotations omitted).

¶ 26 Section 40–4–112 states that the PUC may require public utilities to "carry a proper and adequate depreciation account in accordance with such rules ... as the [PUC] may prescribe." As Glustrom notes, the PUC has exercised its authority to set forth rules requiring public utilities, including Xcel, to "carry a proper and adequate depreciation account." The PUC's rules refer to the federal regulations, and the federal regulations require utilities' depreciation accounts to consider the service life of the property. 18 C.F.R. § 101(22)(B) (2006). The service life

must be supported by "engineering, economic, or other depreciation studies." *Id.*

¶ 27 Section 40–4–112, however, also authorizes the PUC to "determine and by order fix the proper and adequate rates of depreciation of the several classes of property of each public utility." This is what the PUC did here.

¶ 28 Prior to the settlement being reached, Xcel's Director of Capital Asset Accounting submitted testimony to the PUC regarding Comanche 3's depreciation life. She stated that "[t]he depreciable life for [Comanche 3] is based on the whole life that was established for the other units at the respective generating stations because the expectations for useful life are the same." The "other units" are Comanche 1 and Comanche 2, which are part of the same power station as the proposed Comanche 3, and, like Comanche 3, are coal-fired electric power units. She also noted that a depreciation study was completed, she described the process used to complete the study, and she included detail worksheets and other supporting information. Other than her excluded testimony on the coal supply, Glustrom provided no evidence to refute the evidence presented by Xcel. The settlement adopted Xcel's proposed depreciation life, and, based upon Xcel's evidence, the PUC approved it.

¶ 29 Accordingly, we conclude that the PUC abided by section 40–4–112 and the PUC's regulations in setting the 60–year depreciation life for Comanche 3. Further, based on the testimony of Xcel's Director of Capital Asset Accounting and the lack of any evidence contrary to the Director's testimony, we conclude that substantial evidence supported the 60–year depreciation life.

### C.

¶ 30 Lastly, Glustrom argues that the PUC erred by allowing Xcel to include Comanche 3's construction costs in its rates before Comanche 3 became "used and useful." Including Comanche 3 construction costs in the rate base before it is "used and useful," she claims, automatically results in rates that are not "just and reasonable," contrary to Colorado statutes, the Colorado

Constitution, and the United States Constitution. We disagree.

¶ 31 Glustrom relies primarily on *Glenwood Light & Water Co. v. City of Glenwood Springs*, 98 Colo. 340, 55 P.2d 1339 (Colo. 1936), for the proposition that if PUC property is not strictly "used and useful" at the time rates go into effect, the property cannot be included in the rate base. In *Glenwood*, we noted that "[t]he test of whether the value of any given property shall be included in the rate base of a public utility is whether it is used and useful in supplying the commodity or service that the utility has undertaken to furnish." 98 Colo. at 343, 55 P.2d at 1340. "If it is used and useful, it is properly included; if not, it must be excluded." *Id.*; *see also Nw. Water*, 168 Colo. at 179, 451 P.2d at 278–79 (choosing not to disregard the "used and useful" principle, but noting that its application may be unconstitutional where it results in the confiscation of the public utility's property).

¶ 32 When we decided *Glenwood* in 1936, "it was thought that the [United States] Constitution required rates to be set according to the actual present value of the assets employed in the public service," *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 308, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989), a policy known as the "fair value" rule. *See Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898).[15] The "fair value" rule required property to be "used and useful" before it could be included in the rate base. *Denver Union Stock Yard Co. v. U.S.*, 304 U.S. 470, 475, 58 S.Ct. 990, 82 L.Ed. 1469 (1938). In 1944, however, the United States Supreme Court abandoned the "fair value" rule in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 601–02, 64 S.Ct. 281, 88 L.Ed. 333 (1944). *Hope* held that cost was also a valid way to determine a utility's compensation for property, *id.* at 605, 64 S.Ct. 281, and that, when determining whether rates are "just and reasonable," it is the "result reached not the method employed which is controlling," *id.* at 602, 64 S.Ct. 281. Consequently, the "used and useful" principle

lost its constitutional significance. *Jersey Central*, 810 F.2d at 1175. Now, the "used and useful" principle is "simply one of several permissible tools of ratemaking, one that need not be ... employed in every instance." *Id.*

¶ 33 We have reflected these holdings in our own cases. For example, we have reiterated that "it is the result reached, not the method employed, which determines whether a rate is just and reasonable." *Colo. Ute Elec. Ass'n, Inc. v. Pub. Utils. Comm'n*, 602 P.2d 861, 864 (Colo.1979) (citing *Hope* ); *City of Montrose v. Pub. Utils. Comm'n*, 629 P.2d 619, 623 (Colo.1981) (same). Further, we have noted that "[s]ince rate setting is a legislative function which involves many questions of judgment and discretion, *courts will not set aside the rate methodologies chosen by the PUC unless they are inherently unsound.*" *CF & I Steel, L.P. v. Pub. Utils. Comm'n*, 949 P.2d 577, 584 (Colo.1997) (emphasis added); *see also Colo. Ute*, 602 P.2d at 864 ("We would overstep our role and demean the [PUC's] authority in the legislative field of rate making were we to insist that the [PUC] revise its method ... in the absence of persuasive evidence that the challenged method is inherently unsound."). Indeed, "the [PUC] is not bound by a previously utilized methodology when it has a reasonable basis, in the exercise of its legislative function, to adopt a different one." *CF & I Steel*, 949 P.2d at 584.

¶ 34 "[H]e who would upset the rate order ... carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *Hope*, 320 U.S. at 602, 64 S.Ct. 281. Glustrom makes no argument that the rate order here is unjust and unreasonable in its consequences, only that the order is unjust and unreasonable because it departed from the "used and useful" principle. Because a departure from the "used and useful" principle alone does not demon-

---

**15.** The phrase "just and reasonable" is statutory but it coincides with the limits of the United States Constitution. *See Jersey Cen. Power & Light, Co. v. Fed. Energy Regulatory Comm'n,* 810

F.2d 1168, 1175 (D.C.Cir.1987) (en banc) (Bork, J., plurality). Thus cases analyzing the constitutional limits inform our reasoning.

strate that the rate order is unjust and unreasonable in its consequences, Glustrom has failed to meet her burden in showing that the rates here are unjust and unreasonable.

## III.

¶ 35 For the foregoing reasons, we affirm the judgment of the district court upholding the PUC's rulings.